UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| TAYLOR PINCKNEY, )<br>*Plaintiff*, )<br> )<br>v. )<br> )<br>QUINSIGAMOND COMMUNITY COLLEGE, and )<br>PRISCILLA UNDERWOOD, in her Individual and )<br>Official Capacity as a Professor at )<br>Quinsigamond Community College, )<br>    *Defendant*. ) | Civil Action No. 4:20-cv-40047 |

## **COMPLAINT**

### THE PARTIES

1. The Plaintiff, Taylor Pinckney, is an individual who resides at 45 Pearl Street, Worcester County, Leominster, Massachusetts 01453.

2. The Defendant, Quinsigamond Community College, is a public institution of higher education located at 670 West Boylston Street, Worcester County, Worcester, Massachusetts. At all times relevant to this Complaint, Quinsigamond Community College ("QCC") was the employer of Defendant Priscilla Underwood.

3. The Defendant, Priscilla Underwood, is an individual who resides in Worcester County, Massachusetts.

### JURISDICTION AND VENUE

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper in this Court because all events giving rise to the cause of action occurred in the city of Worcester, Massachusetts and all parties reside in Worcester County, Massachusetts.

### FACTS

6. Mr. Pinckney is an adult male who started attending classes full-time at QCC in September of 2018 as part of the Computer Information Systems Program.

7. At all times relevant to this Complaint, Mr. Pinckney was and continues to be classified as a qualified disabled person within the meaning of applicable provisions of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and Title II of the ADA, as amended by the Amendments Act of 2008, 42 U.S.C. § 12131, et seq. ("ADAA").

8. As such, Mr. Pinckney requires and is entitled to reasonable accommodations in the educational setting for his disabilities, he is entitled to participate in and receive the benefits of equal access to the Defendants' educational programs and services, he is entitled to be free from discrimination based on his disability in the provision of those programs/services, and he is entitled to be free from retaliation or intimidation for attempting to enforce his clearly established rights under both state and federal law.

9. QCC is a public institution of post-secondary education, and thus, is subjected to the requirements of both Section 504 and the ADAA.

10. Mr. Pinckney was diagnosed with Schizophrenia in approximately 2008 and suffers from cognitive, emotional, and learning disabilities. As a result, he requires certain academic adjustments and reasonable accommodations in order to be able to complete his coursework.

11. Despite his disability, Mr. Pinckney has always exhibited a passion for school and works hard to achieve his educational goals. Prior to starting at QCC, Mr. Pinckney graduated as the co-valedictorian of his high school and never experienced any issues with teachers as it pertained to his disability.

12. Prior to beginning classes at QCC in the Fall of 2018, Mr. Pinckney informed the QCC Disability Services Department of his disabilities and requested reasonable accommodations. Disability Services agreed to provide accommodations for Mr. Pinckney, and those accommodations were documented in a form provided by the Department.

13. The accommodations that QCC agreed to provide included: recording lectures, receiving copies of class notes, being able to use a calculator, extended time to take examinations and complete in-class graded assignments, placement in a less distracting setting during examinations and in-class graded assignments, having a math chart during exams, additional guidance/assurance of his understanding on directions for exams and in-class assignments, and the ability to leave the classroom when/if he experiences increased disability symptoms.

14. On or about September 6, 2018, Mr. Pinckney sent his approved accommodations to all of his professors for the upcoming fall semester. This included Defendant Priscilla Underwood ("Underwood"), who was his English professor. That same day, Underwood emailed back requesting that Mr. Pinckney bring a hard copy of his approved accommodations to class, which he agreed to do.

15. Throughout the Fall 2018 semester, Underwood inflicted discriminatory treatment upon Mr. Pinckney because of his disability in the form of yelling, scolding, singling out/alienation, and refusing to teach him or allow his reasonable accommodations.

16. By way of example and not limitation, on or about September 7, 2018, Mr. Pinckney attended his first English class with Underwood and provided her with a hard copy of his approved disability accommodations, as she requested.  When he did so, Underwood chastised him for emailing the accommodations the day before, indicating it was "not her policy to accept emailed accommodations" and proceeded to ask him, in the presence of the entire class, what disability he has.

17. Mr. Pinckney was completely caught off guard, as it was his understanding that professors were not allowed to ask about a student's disability in this manner.  Mr. Pinckney was reluctant and embarrassed to disclose the nature of his disability to Underwood, so he responded by saying he had a "mental health disability."

18. In response, Underwood asked again (while students were still present in the classroom) what type of mental health disability Mr. Pinckney had.  Humiliated, Mr. Pinckney was then forced to disclose the nature of his disability, while in the presence of his classmates, on the very first day of school.  Mr. Pinckney has never before been confronted in this manner by a teacher or professor about his disability.

19. Underwood also told him during that same class in the presence of other students that he had to go to the Disability Services office because she was dissatisfied with the arrangement of his accommodations.

20. That same day, on September 7, 2018, Mr. Pinckney reported these incidents to Disability Services and expressed his discomfort at the situation, as well as his concern that his diagnosis was a problem in Underwood's eyes.  In response, Disability Services admitted that professors were prohibited from inquiring about a student's disability/diagnosis as Underwood had, however, they failed to alert Underwood of this or reprimand her in anyway. Instead, Disability Services told Mr. Pinckney to "practices comfortable responses" to these kinds of questions in case they arise with another professor at the school.

21. In the following months, Underwood routinely refused to provide Mr. Pinckney with his documented reasonable accommodations and consistently treated Mr. Pinckney (along with other disabled students) differently than non-disabled students, as if he was a burden to Underwood because of his disabilities.  By way of example and not limitation, the following incidents occurred:

22. She would lash out at Mr. Pinckney in the presence of the class when he requested a note-taker; she refused to provide him with the notes that she took for the class beyond

the first couple weeks; and she informed him that she was not obligated to provide him with any notes, even though Disability Services had approved that accommodation.

23. She would not allow Mr. Pinckney to take as-needed breaks during class, in violation of his approved accommodations. On more than one occasion, Underwood prevented him from even taking a bathroom break and would tell him that if he left class, even just to go the bathroom, that he would be marked absent for the entire class. She would even lock the door to the classroom at times.

24. Underwood refused to provide Mr. Pinckney with extra time to complete assignments and forced him to complete his assignments in the same time frame as non-disabled students. Unsurprisingly, his grades suffered as a result.

25. She refused to provide Mr. Pinckney with assistance or support for in-class assignments and would not allow questions during in-class assignments, despite Mr. Pinckney's reasonable accommodation allowing for additional assurance/guidance on the directions for such assignments.

26. On one occasion the entire class submitted a rough draft of a paper, and Underwood corrected everyone else's draft and handed them back, but refused to make corrections on Mr. Pinckney's paper and did not hand it back to him or provide feedback like she did for the other students. Instead, Underwood gave his paper to the Disability Services office (along with that of another disabled student) and later forced Mr. Pinckney to redo the paper in the Disability Services office, without providing him any support or feedback.

27. Anytime Mr. Pinckney or other disabled students would attempt to convey their needs to Underwood, she would "out" their status of having a disability in front of the class by either publicly discussing their accommodations or shutting them down completely and telling them to go to Disability Services.

28. In addition to his first complaint about Underwood's behavior from September 7, 2018, Mr. Pinckney also reported these incidents on numerous other occasions to multiple people at QCC, including the staff at the Disability Services office, as well as the Dean of Compliance, faculty within the English Program, an Affirmative Action Officer, and the Human Resources Department at QCC.

29. On one occasion in September of 2018, Mr. Pinckney reported Underwood's behavior over his need for a notetaker, as described above, and requested a notetaker through Disability Services. No immediate action was taken, and he had to wait a month before a note-taker was provided and then approved by Underwood. As a result, his comprehension of the course's subject matter and ability to follow along suffered.

30. On November 12, 2018, Mr. Pinckney reported his complaints against Underwood again in an email to the Dean of Compliance, Liz Woods, among others.  In his email, Mr. Pinckney explicitly specified that he was experiencing disparate treatment based on his disability.

31. The next day, on November 13, 2018, Mr. Pinckney met with the Dean Liz Woods in-person and again reiterated his complaints against Underwood of disability discrimination.  In response, the Dean's proposed solution was that he could stop attending class.  At this point, no investigation into his complaints was undertaken, and no one reprimanded Underwood for the reported conduct, or even discussed it with her.

32. Not wanting to jeopardize his grade in the class or run the risk of having to re-take it, Mr. Pinckney continued to attend class, despite the ongoing mistreatment by Underwood and lack of intervention by QCC.  As a result, Mr. Pinckney began to experience significant stress, fear, anxiety, and humiliation, which only worsened his disability symptoms and decreased his ability to learn.

33. Unfortunately, Underwood's conduct continued, and on November 20, 2018, Mr. Pinckney again reported his complaints, in-person, to the Dean of Compliance as well as QCC's Assistant Director of Human Resources, Sara Simms, who also served as the school's Affirmative Action Officer.  At this meeting, Mr. Pinckney was given a copy of QCC's policy on Affirmative Action, Equal Employment, & Diversity and was told that he could file a written complaint if he wanted to.  No action was taken by QCC after this meeting.

34. Underwood subsequently became aware that Mr. Pinckney had made complaints about her to the school, and in retaliation, Underwood forced Mr. Pinckney to resubmit assignments to the Disability Services office that he had already submitted and even required him to have Disability Services sign his work before turning it into her.  Upon information and belief, no other student in the class was required to do these things.

35. On another occasion, Underwood gave Mr. Pinckney explicit instructions on how to complete an in-class assignment, and when he followed her instructions, she proceeded to mark all of his answers as incorrect.

36. On December 3, 2018, Mr. Pinckney filed an Affirmative Action Complaint against Underwood for her ongoing disability discrimination and attended another meeting with school officials thereafter where he reiterated his complaints again.  Finally, QCC opened up an investigation into Mr. Pinckney's repeated complaints.

37. On December 7, 2018, Mr. Pinckney met HR/an Affirmative Action Officer to discuss the next steps he needed to take throughout the complaint process.  At this meeting, the school urged him to withdraw from the course, and did not provide additional options.

38. Several days later, on December 10, 2018 (five days into the "investigation"), the Assistant Director of HR/Affirmative Action Officer, upon conferring with the Dean of English academics at QCC, told Mr. Pinckney that his "alternative" options were to take an "incomplete" for the entire course – without getting credit for all the work he completed already - and that he would have to take an additional independent study with another professor in the Spring semester in order to make up for it.

39. Ultimately, Mr. Pinckney's humiliation, discomfort, anxiety, and stress - as a result of both Underwood's conduct and QCC's mistreatment through its lack of action in response to his complaints - became unbearable and he was forced to stop attending the class and take the incomplete.

40. The investigation into Mr. Pinckney's complaints, which consisted of witness statements/interviews of multiple students within the class and Disability Services staff, subsequently revealed the following:

41. Students reported that Underwood was routinely difficult and would not take the time to help students that did not understand assignments;

42. Underwood would not allow questions during in-class assignments, even if there was a reasonable accommodation in place;

43. If a student said they were having trouble because of their disability, Underwood would address it in front of the entire class and speak about their accommodations publicly;

44. Underwood would "out" disabled students by telling them to go to Disability Services in front of other students.

45. On one occasion, Underwood refused to listen to a student in the class who attempted to convey their disability needs to the point where the student was forced to come back to class with a Disability Services representative in order to speak with her;

46. QCC was aware of Underwood's history of "outing" students with disabilities in class by asking about their accommodations in front of other students (as reported to the investigator by a Disability Services staff member); and

47. Students had previously voiced concerns to QCC about Underwood's "outing" of disabled students in class (as reported to the investigator by a Disability Services staff member).

48. When confronted with the Preliminary Findings of the investigation and asked to respond, Underwood continued to target and discriminate against Mr. Pinckney and viciously attempted to undermine his credibility by suggesting that his complaints against her were simply the result of the "effects of his disability," and as such, not to be

believed. She even went so far as to include unverified articles from the internet on schizophrenia in her response and suggested that Mr. Pinckney's complaints against her should be chalked up to the product of schizophrenic "fear or suspicions regarding others' intentions."

49. Of note, Underwood has absolutely no medical or psychiatric training/education, or any other professional qualification that would even remotely qualify her to render such opinions. Further, Underwood is the only professor Mr. Pinckney filed complaints against because he did not have any issues or problems of this nature with his other professors at QCC, and he never had such issues with other teachers during high school.

50. In the same response, Underwood further targeted Mr. Pinckney's disability and cited to his past medical inpatient history, which occurred well before he ever came to QCC, as a suggested basis for why his complaints should not be believed.

51. Underwood's disdain for Mr. Pinckney's presence in her class because of his disability was even more evidenced in the portion of her response where she attempted to abdicate responsibility and indicated that she's not "Special Education" faculty.

52. Ultimately, the investigation concluded that Underwood violated QCC's Affirmative Action Policy and that her comments and conduct toward Mr. Pinckney were "objectively unwelcome" and had the purpose or effect of creating an objectively intimidating, hostile, or offensive education environment, unreasonably interfered with Mr. Pinckney's learning performance, and did adversely affect Mr. Pinckney's educational opportunities in the class.

53. Despite the egregious nature of the investigation's findings, QCC did not reprimand or formally discipline Underwood in anyway, rather, QCC merely "recommended" that she complete an online training session regarding disability services. Meanwhile, Mr. Pinckney – the victim – was forced to withdraw from the course and take an incomplete, did not receive any credit for the coursework he completed, and was not refunded the cost of the course.

54. As a result of Defendant Underwood and Defendant QCC's conduct, Mr. Pinckney suffered and continues to suffer from significant emotional distress, mental anguish, diminished self-esteem, loss of interest/enjoyment in previous educational pursuits, financial losses, setbacks in his emotional and educational development, as well as worsened disability symptoms.

**CLAIMS**

CLAIMS OF THE PLAINTIFF AGAINST ALL THE DEFENDANTS

COUNT I
VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973

55. The Plaintiff repeats the allegations set forth above as if fully contained herein.

56. The Plaintiff is a qualified individual with disabilities within the meaning of Section 504 and the Defendant is a public community college that receives federal funds, and as such, must comply with the provisions of Section 504 and the regulations promulgated thereunder (34 C.F.R. § 104, et seq.).

57. The Plaintiff had clearly established rights under the applicable provisions of Section 504 to participate in and receive the benefits of equal access to the Defendants' educational programs and services and to be free from discrimination based on his disability in the provision of those programs and/or services.

58. At all times relevant to this Complaint, the Defendants acted under the color of state law in their official capacities, and in doing so via the aforementioned conduct, willfully violated these clearly established rights of Mr. Pinckney.

59. As a direct and proximate result of the Defendants' violations of Section 504, the Plaintiff suffered and continues to suffer significant damages, including but not limited to emotional distress, mental anguish, diminished self-esteem, loss of interest in previous educational pursuits, financial harm, setbacks in his emotional and educational development, and worsened disability symptoms.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

COUNT II
RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

60. The Plaintiff repeats the allegations set forth above as if fully contained herein.

61. The Plaintiff has a clearly established right under Section 504 to be free from retaliation for filing a complaint of discrimination and for his efforts to advocate for his rights under Section 504.

62. At all times relevant to this Complaint, the Defendants acted under the color of state law in their official capacities, and in doing so via the aforementioned conduct, willfully violated Mr. Pinckney's clearly established right to be free from retaliation.

63. As a result of the Plaintiff's attempts to advocate for reasonable accommodations in the provision of his education and to enforce his right to be free from discrimination by filing complaints against Defendant Underwood, the Plaintiff has incurred educational setbacks, endured coercion and intimidation by QCC staff, and was subjected to increased discrimination, animosity and unwarranted obstacles in the provision of his education – all of which constitute retaliatory actions in violation of Section 504.

64. As a direct and proximate result of the Defendants' willful violations of the Plaintiff's right to be free from retaliation, Plaintiff has suffered and continues to suffer significant damages, including but not limited to emotional distress, mental anguish, diminished self-esteem, loss of interest in previous educational pursuits, financial harm, setbacks in his emotional and educational development, and worsened disability symptoms.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

## COUNT III
## VIOLATIONS OF TITLE II OF THE ADA, AS AMENDED BY THE AMENDMENTS ACT OF 2008, 42 U.S.C.A. § 12131, et. seq ("ADAA")

65. The Plaintiff repeats the allegations set forth above as if fully contained herein.

66. At all times relevant to this Complaint, the Plaintiff was a qualified, disabled individual within the meaning of the ADAA and as such, was entitled to all the rights afforded under Title II of the ADA, as amended, including the right to reasonable accommodations in the provision of his education, equal access to educational programs/services, and the right to be free from discrimination based on his disability.

67. At all times relevant to this Complaint, Defendant Underwood acted in her official capacity as a Professor, as did other employees of the Defendant QCC in their respective positions.

68. The Defendants, acting under the color of state law, willfully violated Mr. Pinckney's rights and discriminated against him on the basis of his disability, interfered with his reasonable accommodations, and denied him the benefits of and excluded him from participation in equal access to QCC's educational programs/services, by way of the aforementioned conduct.

69. As a direct and proximate result of the Defendants' willful violations of the Plaintiff's rights under the ADAA, the Plaintiff has suffered and continues to suffer significant damages, including but not limited to emotional distress, mental anguish, diminished self-esteem, loss of interest in previous educational pursuits, financial harm, setbacks in his emotional and educational development, and worsened disability symptoms.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

## COUNT IV
## DEPRIVATION OF RIGHTS IN VIOLATION OF 42 U.S.C. § 1983

70. The Plaintiff repeats the allegations set forth above as if fully contained herein.

71. At all relevant times, the Plaintiff had clearly established rights, under both state and federal law, to be free from discrimination based on his disability, to be free from retaliation for advocating for his rights, to be afforded reasonable accommodations, and to enjoy equal access to the benefits of educational programs/services at QCC.

72. The Defendants, while acting under the color of state law, violated these clearly established rights of the Plaintiff and/or acted with deliberate indifference as to such by way of the aforementioned conduct.

73. Defendant Underwood, in her official capacity as a professor, had the authority and ability to implement, assist, and provide the reasonable accommodations afforded to her disabled students, as well as the authority, ability, and obligation to not discriminate against students on the basis of their disability in the provision of these programs/services, or deny/exclude them from enjoying equal access to the benefits of or participating in QCC's educational services.  As such, Defendant Underwood's conduct and decisions to act/not act, as described above, constituted official policies and practices of QCC.

74. Defendant QCC employees within the Disability Services office, the HR Office, and those with Affirmative Action Compliance roles, in their respective official capacities, had the authority, ability, and obligation to provide reasonable accommodations to qualified students and address and investigate student complaints of discrimination, as well as the authority and ability to decide and oversee the manner in which investigations of discrimination were conducted, any discipline implemented as a result, and which staff members were hired and/or fired.   As such, Defendant QCC's conduct and decisions to act or not act, as described above, constituted official policies and practices of QCC.

75. The Defendant QCC also had actual knowledge of the disability discrimination inflicted upon students, including the Plaintiff, by Defendant Underwood via multiple direct

reports/complaints made by the Plaintiff to appropriate QCC staff and from prior reports/complaints made by other students against Underwood before the Fall of 2018. At all times, Defendant QCC had a reasonable opportunity to intervene or stop the discrimination, and to discipline Defendant Underwood because of it, but failed to do so.

76. Instead, Defendant QCC was complicit in the behavior and also participated in the unlawful behavior, acting with deliberate indifference to the rights of the Plaintiff, as well as other students.

77. As a direct and proximate result of the Defendants' willful violations of the Plaintiff's clearly established rights under state and federal law, the Plaintiff has suffered and continues to suffer significant damages, including but not limited to emotional distress, mental anguish, diminished self-esteem, loss of interest in previous educational pursuits, financial harm, setbacks in his emotional and educational development, and worsened disability symptoms.

WHEREFORE, the Plaintiff demands judgment against the Defendants for the above-described damages, plus punitive damages, attorney's fees, costs, interest, and further relief to which he is entitled.

<u>DEMAND FOR A JURY TRIAL</u>

The Plaintiffs demand a jury trial on all claims herein.

Respectfully Submitted,

The Plaintiffs,
By their attorneys,
KJC Law Firm, LLC

**/s/ John T. Martin**
John T. Martin; BBO# 676344
jmartin@kjclawfirm.com
Michaela M. Weaver; BBO# 705985
mweaver@kjclawfirm.com
KJC Law Firm, LLC
1 Exchange Place
Worcester, MA 01608
(617) 720-8447

Dated: <u>April 29, 2020</u>